IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| TRI-UNION DEVELOPMENT | § | CASE NO: 03-44908 |
| CORPORATION | § | |
|     Debtor(s) | § | |
| | § | CHAPTER 11 |
| | § | |
| JEFFREY A COMPTON | § | |
|     Plaintiff(s) | § | |
| | § | |
| VS. | § | ADVERSARY NO. 05-3758 |
| | § | |
| PLAINS MARKETING, LP | § | |
|     Defendant(s) | § | |

## **MEMORANDUM OPINION**

For the reasons stated below, the Court finds that the transfer that is the subject of this adversary qualifies as a transfer in the ordinary course of business. Consequently, the Trustee is not entitled to recover the transferred funds as a preference.

### Background

Tri-Union Development Corporation ("Tri-Union" or "Debtor") filed for bankruptcy on October 20, 2003. Four days prior to filing, on October 16, Debtor transferred by direct deposit the sum of $94,348.50 to the defendant, Plains Marketing L.P. ("Plains").

On October 17, 2005, Jeffrey Compton, Trustee of the Tri-Union Class 4A Creditors' Trust ("Trustee"), filed this adversary. Trustee alleges that the October 16th transfer is avoidable under 11 U.S.C. § 547(b). Plains asserts the affirmative defense of § 547(c), namely, that the transfer was made in the ordinary course of business and may not be avoided. Plains also asserts the affirmative defense of constructive trust.

On July 20, 2006, the Court held a trial in this case. The Trustee's case in chief, asserting that a § 547(b) transfer was made, was stipulated to by Plains. Consequently, the only issues to be resolved are Plains' defenses. At the conclusion of the evidence, the Court requested briefing on whether a first-time event can qualify as within the ordinary course of business for the purposes of § 547(c). Both parties timely submitted briefs.

## Findings of Fact and Conclusions of Law

**Ordinary Course of Business**

Section 547(c) provides that:

(c) The trustee may not avoid under this section a transfer--
    (2) to the extent that such transfer was--
        (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
        (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
        (C) made according to ordinary business terms;

11 U.S.C. § 547(c)(2)(amended April 20, 2005).

A creditor asserting the affirmative defense that a payment was in the ordinary course of business must prove all three statutory elements (§ 547(c)(2)(A), (B) and (C)) by a preponderance of the evidence in order to prevail. *G.H. Leidenheimer Baking Co. v. Sharp (In re SGMSM Acquisition Co.)*, 439 F.3d 233, 239 (5th Cir. 2006).

The first element is not at issue in this case, as Debtor had a history of selling oil to Plains on a monthly basis, and Plains had a history of occasionally overpaying. As explained in more detail below, overpayments and underpayments were a routine part of a monthly "true up" that matched actual deliveries to estimated deliveries. What is at issue in this case is the method in which the "true up" of the overpayment by Plains for the July 2003 Oil was resolved. Was the

true-up transfer made "in the ordinary course of business or financial affairs of the debtor and the transferee"? 11 U.S.C. § 547(c)(2)(B).

There is no precise legal test for evaluating whether a transfer complies with the second prong of § 547(c)(2). *GasMark Ltd. Liquidating Trust v. Louis Dreyfus,* 158 F.3d 312, 317-18 (5th Cir. 1998). Rather, the analysis tends to be very fact specific, with courts typically comparing prior dealings between the parties with their dealings during the preference period. *In re Tulsa Litho Co.,* 229 B.R. 806, 809 (10th Cir. BAP 1999); *GPR Holdings, LLC v. Duke Energy Trading and Mktg., LLC (In re GPR Holdings, LLC),* No. 01-36736-SAF-11, 2005 Bankr. LEXIS 1059, *42 (Bankr. N.D. Tex. May 27, 2005).

In this case, the Debtor and Plains had a relationship spanning over two years. Beginning in May 2001, Plains would buy oil from Tri-Union's Eugene Island Block 277 Lease ("EI 277"). On a monthly basis, Tri-Union would nominate[1] the number of barrels it expected to deliver to Plains. Delivery was typically made via a third party gathering system. On the 10th working day of each month, Plains would close the books on the prior month's oil production. Usually, before the books were closed, the third party would deliver "run tickets" detailing the number of barrels delivered by Tri-Union and sold to Plains. Books would usually be closed based on these run tickets. Adjustments to the quantities specified in the run tickets, as well as adjustments to estimates of quality were often made after the books were closed. Payment was always made on the 20th calendar day of each month. Often times, the estimates of quantity and quality were still not resolved by the payment date. This led to a system of constant reconciliations between the two parties as estimates were eventually resolved.

---

[1] "Nominate" is an industry term. In basic terms, it is an estimation of the quantity of oil that a producer expects to ship to a buyer.

In some cases, run tickets were not timely received, and Plains would close its books based on nominations. Later, when run tickets were received, the parties would reconcile the difference against future months. For example, for March 2002 Oil, run tickets were not received before the 10th working day of April. On April 12, Plains booked its barrels received based on the nomination provided by Tri-Union, which forecasted 15,500.00 barrels. The payment sequence was initiated. On April 18, Plains received information that only 6,824.67 barrels were produced. Plains reversed the 15,500.00 booking and entered 6,824.67, so that its records would be correct. However, it was too late for Plains to stop payment on the 15,500.00 barrels. Instead of Tri-Union quickly returning the overpayment to Plains, Plains recouped its overpayment against April 2002, May 2002, and an additional March 2002 adjustment. This is how overpayments and adjustments were typically handled—as adjustments against future months—until the July 2003 transfer that is the subject of this case.

For July 2003 Oil, Plains booked its barrels bought from the EI 277 lease based on a nomination. The number of barrels was booked on August 13, 2003. That night, a direct deposit of $94,348.50 was scheduled. This deposit, like Plains' other direct deposits, could not be reversed once it was scheduled. On August 18, 2003, Plains received notice from Tri-Union that the EI 277 lease was shut in and would not be producing oil until further notice. Consequently, Plains zeroed out its books by recording a negative barrel production equal to the nomination. At this point, Plains had overpaid Tri-Union for July production by $94,348.50.

On September 16, 2003, Grace Munn, a Plains employee in the Revenue Accounting Department, noticed that Tri-Union was in credit suspense for approximately $95,000. She also noticed that EI 277 had not been producing. Ms. Munn inquired with Plains as to the status of the EI 277 lease and was told "Since July 1, 2003 this lease has been shut in and will not be

active again until further notice.  I think they are going to dismantle this line; so I wouldn't hold my breathe [sic] for it to start again." (Plains Ex. 6).  The next day, Patricia Banzhof emailed Tri-Union and asked "Do you know if this block will be coming back on anytime or shut down permanently?  How do you want to handle this credit suspense?"  Tri-Union answered "I don't know when EI 277 is be [sic] coming back on line, but I don't think it is any time soon.  I think the best way to handle the credit is to send an invoice." (Plains Ex. 6).

An invoice was sent to Tri-Union stating that the sum of $94,384.50 was paid for 3,100 barrels that were never delivered.  Therefore, $94,348.50 was due to Plains.  The invoice included wiring instructions.  Tri-Union wired the amount to Plains on October 16, 2003.  Tri-Union declared bankruptcy on October 20, 2003.

In evaluating the transfer in question, and comparing it to past transfers between the parties, the Court finds that the circumstances surrounding this transfer are unique.  In the case of past overpayments, future production was always expected, and overpayments were held pending eventual offset.  However, in this situation, no future production was expected, hence there could be no future offsets.  The transfer under review was the result of a new event in the relationship of the parties—the permanent shut-in of well EI 277, with an overpayment not yet resolved.

Trustee argues that a similar situation arose between the parties in November 2002, and that actions in that situation should set the benchmark for "ordinary course of business."  In that month, Plains paid $43,613.09 for 1,732.81 barrels.  However, no oil was produced for November.  EI 277 did not produce oil again until April 2002.  Plains sent a letter to Tri-Union stating "Plains Marketing LP no longer purchases crude oil from you on the listed properties [EI 277]….  Because we no longer make disbursements to you, we respectfully request that you

promptly submit your payment …." (Plains Ex. 1, p. 109).  Trustee argues that, since a letter was sent in the November 2002 case of payment with no production, that is the standard that the July 2003 payment should be measured against.

The Court does not agree.  The Court finds that the letter sent to Tri-Union by Plains employee Grace Munn was sent in error.  Undisputed testimony shows that Plains continued doing business with Tri-Union after the date of the letter.  Thus the letter is incorrect in its primary assertion that "Plains no longer purchases crude oil from [Tri-Union]."  Ms. Klumpyan also testified that the language in the letter was most likely taken from a form letter written by upper management. (Testimony of Kathy Klumpian).  These assertions were undisputed at trial.  No other evidence was offered that the November 2002 shut-in was understood to be permanent.  In contrast, the July 2003 shut-in was expected to be permanent.  In sum, the Court finds that, based on the circumstances, the July 2003 overpayment by Plains was a *sui generis* event.  The next issue to be resolved is whether this unique transfer can be considered as made in the ordinary course of business between Debtor and Plains.

### *Sui Generis* and Ordinary Course of Business

Courts are split on whether a one time event can qualify as within the ordinary course of business between two parties.  A minority of courts have articulated a per se rule that a one time transfer cannot qualify as a transfer in the ordinary course of business for the purposes of § 547(c)(2)(B).  *In re Winters*, 182 B.R. 26, 29 (Bankr. E.D. Ky. 1995)("[547(c)(2)] does not apply to single, isolated transactions…."); *In re Brown Transport Truckload, Inc.*, 152 B.R. 690, 692 ("If there is no prior course of dealings between the parties, the transferee cannot satisfy [§ 547(c)(2)(B)], and the transfer may be avoided.").  However, the focus of courts applying such a rule is that there were no past dealings between the parties, and thus no ordinary course of

business. That is not the case in the present action. The Debtor and Plains had many dealings over the course of the years. However, the permanent shut-in of production presented a new problem that had to be addressed within that historic relationship.

In its post-trial brief on this issue, the Trustee states that "If the Court finds this was a one-of-a-kind event, there is no legal basis for finding it was in the ordinary course." (Plaintiff's brief, p. 7). The Court disagrees. "Obviously every borrower who does something in the ordinary course of her affairs must, at some point, have done it for the first time. We hold that … a transaction can be in the ordinary course of financial affairs even if it is the first such transaction undertaken by the customer." *In re Finn,* 909 F.2d 903, 908 (6th Cir. 1990). *Accord Kleven v. Household Bank, F.S.B.,* 334 F.3d 638 (7th Cir. 2003). This Court agrees that "an appropriate ordinary course analysis requires a recognition that a variety of events in the course of the parties' business history may be found ordinary, even though these events never occurred in the parties' history." *In re Roberds, Inc.*, 315 B.R. 443, 461 (Bankr. S.D. Ohio 2004).

Having determined that a singular event may be ordinary for the purposes of § 547(c)(2)(B), the Court must now determine whether the particular transfer at issue in this case can be considered ordinary. Other courts that have determined that a one-of-a-kind event may be ordinary have sought to determine if the "transaction [in question] would not be out of the ordinary for a person in the borrower's position." *In re Finn,* 909 F.2d at 908. In other words, a court "should examine the conduct of the parties to determine whether either of them did anything unusual or extraordinary with respect to the transfer made in payment of the underlying debt." *In re Forman Enterprises, Inc.*, 293 B.R. 848, 856 (Bankr. W.D. Pa. 2003). The burden of showing that the transfer was ordinary rests with the defendant. This Court has viewed the

totality of the surrounding facts to conclude whether the Defendant has shown that the payment was an ordinary course payment.

When considering facts particular to a case, courts have come to a rough consensus as to what factors are most important. Typically, courts look to the length of time the parties were engaged in the transaction in issue, whether the amount or form of tender differed from past practices, whether the creditor engaged in any unusual collection activity, and the circumstances under which the payment was made (i.e. whether the creditor took advantage of the debtor's weak financial condition). See *Barber v. Golden Seed Co.*, 129 F.3d 382, 390 (7th Cir. 1997); *In re Grand Chevrolet, Inc.*, 25 F.3d 728, 732 (9th Cir. 1994); *In re Fred Hawes Org., Inc.*, 957 F.2d 239, 244 (6th Cir. 1992); *In re Roberds*, 315 B.R. at 455.

The length of time that this transaction required appears to be typical of previous time periods required by the parties: the payment was made for July 2003 Oil by the 10th working day of August; the state of the well was ascertained by Plains in August, around the time that adjustments were often received; accounting followed up with Tri-Union in September; the transfer was made to Plains in October. There was no evidence that the amount paid was at odds with the expected number of barrels to be purchased. The form of payment differed from the past, but that is because there would not be a future opportunity to offset the payment. Finally, and most importantly, there was no unusual collection activity.

This Court finds the evaluation of collection activities to be especially important. One stated purpose of the preference section is that "by permitting the trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during his slide into bankruptcy." H.R. REP. 95-595 at 177 (1977). The Court reads Congress's reference to a 'race to dismember' as a

particular warning against coercive collection efforts. Other courts have also focused on this element when determining ordinary course of business. See *In re Accessair, Inc.*, 314 B.R. 386, 393 (8th Cir. BAP 2004)("Any payment that the debtor makes to the creditor in response to the creditor's unusual collection efforts is not subjectively ordinary for the purposes of § 547(c)(2)(B)."); *In re Spirit Holding Co., Inc.*, 152 F.3d 902, 94-905 (8th Cir. 1998)("The relevant legislative history … states that the ordinary-course-of-business exception discourages unusual action by either the debtor or his creditors")(citations omitted); *In re Midway Airlines, Inc.*, 180 B.R. 1009, 1015 (Bankr. N.D. Ill. 1995)(significant factor in finding ordinary course of business was lack of any unusual collection activity).

In this case, Plains was not involved in any coercive collection activities whatsoever. The agreement to pay the outstanding balance is evidenced by the following email chain:

> On September 17, 2003, at 9:39 a.m., Patricia Banzhof wrote to Greta Hockman: "Greta – do you know if this block will be coming back on anytime or shut down permanently? How do you want to handle this credit suspense?"
>
> At 9:50 a.m., Greta Hockman responded: "Hi Pat, I don't know when EI 277 is be [sic] coming back on line, but I don't think it is any time soon. I think the best way to handle the credit is to send an invoice. You can send it to my attention. If you mail it, make sure it is sent to the 801 Travis, Suite 2102 address. Some companies are still sending things to our old address. Thanks, Greta."

(Plains Ex. 6).

The Court finds that the particulars of the transaction that the Trustee seeks to avoid were not unusual. New events arise within a business relationship. Such events are not excluded from the ordinary course of business exception simply because they have not arisen before. In a situation when such an event occurs, a fact intensive evaluation of the event must occur. In this case, the well from which Plains was buying oil was permanently shut-in for the first time in the relationship of the parties. There was an overpayment due to Plains, which typically would have

been credited against future balances. Since there would be no future balances, Tri-Union returned the overpayment via a direct deposit, thereby equalizing the account. The action was ordinary for the sake of § 547(c)(2)(B).

The final element of § 547(c)(2) that must be met is that the transfer was "made according to ordinary business terms." 11 U.S.C. § 547(c)(2)(C). This element is considered to be "objective" and the determination as to its fulfillment is made by comparing "the credit arrangements between other similarly situation debtors and creditors in the industry." *In re SGSM Acquisition Co., LLC*, 439 F.3d 233, 239 (5th Cir. 2006)(internal quotations omitted). In this case, the element is uncontested. Mr. Witty testified that, within the industry, recoupment of overpayments are typically made via future production or via direct payment. (Testimony of Charles B. Witty III). No rebuttal evidence was offered, and the Court accepts Mr. Witty's testimony.

Finally, Plains has also argued affirmatively that the sum of $93,348.50 was held by Tri-Union in constructive trust for Plains. The Court does not agree. Funds held in constructive trust are not subject to preference actions. *In re Southmark Corp.*, 49 F.3d 1111 (5th Cir. 1995). Additionally, state law determines whether property is held in constructive trust for another. *Id.* at 1118. Plains relies primarily on *Cocke v. Pacific Gulf Development Corp.*, 595 S.W. 2d 545 (Tex. Civ. App. 1980), for the proposition that a constructive trust can be imposed as a result of a mistaken payment.

The Court agrees that *Cocke* allows constructive trusts in situations beyond the traditional actual and constructive fraud scenarios. Specifically, *Cocke* allows constructive trusts to redress wrong or unjust enrichment, so that the basic principles of equity and justice are served. *Id.* at 548. In *Cocke*, it was Mr. Cocke, the plaintiff, who caused funds to be paid to him, when they

were actually due to a third party. The Court found that this was sufficient grounds for a constructive trust to be placed on the money that Mr. Cocke incorrectly held.

In this case, the equities do not weigh in favor of creating the judicial fiction of a constructive trust. It is true that Plains paid gratuitous sums to Tri-Union. However, Tri-Union, unlike Mr. Cocke, was not the cause of this mistake. Tri-Union provided nominations, like always, and this established an account payable. Plains had notice on August 18 that EI 277 did not produce for July and was unlikely to produce in the future. Regardless, Plains issued a payment to Tri-Union on August 22. The Plains system of accounting is inflexible, and the Court does not believe that Tri-Union should bear the burden for this inflexibility.

A separate judgment consistent this memorandum opinion will be issued.

Signed at Houston, Texas, on September 7, 2006.

MARVIN ISGUR
United States Bankruptcy Judge